Filed 2/3/15  P. v. Thompson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065083 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD245357) |
| STACEY LYNN THOMPSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed.

Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Stacey Lynn Thompson of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)) and found true she inflicted bodily injury in the commission of that offense (§ 12022.7, subd. (a)) and did so under circumstances involving domestic violence (§ 12022.7, subd. (e)). The court found the instant case to be "unusual," suspended Thompson's sentence and granted three years formal probation, with credit for time served.

On appeal, Thompson contends the court abused its discretion and thus erred when it refused to allow the defense to cross-examine victim Jason Fish regarding the maximum punishment he *might* face *if* it was found he violated the terms of his probation. Thompson also contends defense counsel was ineffective for failing to object to testimony by law enforcement regarding statements made by a witness on the night of the attack, after the witness ambiguously testified he could not remember making such statements. Finally, she contends the court erred when it instructed the jury pursuant to CALCRIM No. 3471, which pertains to an initial aggressor and his or her right to self-defense.

As we explain, we reject these contentions and affirm the judgment of conviction.

---

[1]    Unless otherwise noted, all statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Prosecution Evidence*

In the evening in late December 2012, Fish, Thompson and others went inside a public bathroom on Mission Bay Drive to escape the rain. Fish and Thompson had known each other for about a month and had met in the park area of Mission Bay, where they were living. In addition to hanging out together, Fish and Thompson had sexual intercourse twice in Thompson's car. However, Fish told Thompson he was not interested in getting into a relationship because he had just gotten out of one.

Before entering the bathroom on the night of the attack, the group drank in the park area of Mission Bay. Once inside the bathroom, they all continued to drink. Fish saw Thompson was drinking but was unsure if she was intoxicated. Fish said he became "pretty drunk" that night. Fish and Thompson had argued the day before, which had led to Thompson punching Fish in the head. While in the bathroom, Fish spoke to his former girlfriend on his cell phone. During the conversation, Fish told his former girlfriend he still loved her. Thompson, who overheard the conversation, immediately became angry and snatched Fish's phone.

Fish testified that after he got his phone back from Thompson, he started to walk out of the bathroom. Thompson followed and, from behind, stabbed Fish with a knife in the back of the neck and in the shoulder blade. She then used the knife to slice Fish from

_____

[2]    We view that evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Certain portions of the factual and procedural history related to the contentions raised by Thompson are discussed *post*.

his shoulder to his elbow. When Fish attempted to grab the knife from Thompson, she pulled it away, slicing Fish from his knuckle to the bottom of his palm. Thompson also stabbed Fish in the right shoulder.

In shock after returning to the bathroom, Fish fell to the floor. When he awakened, he was surrounded by paramedics and police officers. Under questioning, Fish stated his wounds were self-inflicted. Fish testified he told the police the wounds were self-inflicted because he initially did not realize how badly he was hurt and because he did not want Thompson to get in trouble. Fish needed about 70 staples to close his wounds. After Fish got out of the hospital, he told the police that Thompson was his attacker.

Witness Donald Page testified he was drinking heavily in the bathroom with Fish and Thompson on the night of the attack. Page knew Fish and Thompson from the Mission Bay park area. At some point, Page fell asleep. Later in the evening, Page awakened when another friend entered the bathroom. Page saw blood everywhere and saw Thompson sitting on the floor. Fish was not moving.

Page testified he could not recall giving a statement that night to "his friend" Sergeant Davis. Page said he was unconscious when the attack occurred. As discussed *post*, Officer Richard Garcia testified he was standing next to Sergeant Davis when, in response to questioning immediately after the attack, Page said, "She [i.e., Thompson] stabbed him in the back of the neck, then sliced him.'" Page testified he "could have" made this statement. However, Page denied making the statement to Sergeant Davis that the reason for the attack was because Fish "'fucked that bitch over there.'"

4

Page testified the day before the stabbing he heard Fish and Thompson arguing and saw Thompson chasing Fish around a parking lot, "slapping him [i.e., Fish] around pretty good." According to Page, Fish was running from Thompson and was attempting to avoid the conflict.

Witness Garold Crosbie testified that about 1:00 a.m. on the night of the attack, he went into the bathroom to use a power outlet. When he entered, Crosbie saw blood everywhere and saw his friend Thompson sitting against the wall. Thompson was shaking and appeared to be shock. According to Crosbie, Page was awake and was sitting right next to Thompson. Crosbie asked if anyone needed an ambulance. At that point, Crosbie saw his friend Fish, who was under a blanket, sit up and heard him say, "'Maybe you can call me one.'" When Crosbie asked what happened, Thompson said, "'I couldn't let him fuck me up. It isn't right.'" Crosbie saw Thompson's hand covered in blood. Crosbie left and called 911.

San Diego Police Officer Richard Garcia testified he was the first officer to respond to the attack. When he entered the bathroom, he saw a woman he later identified as Thompson calmly sitting on the floor. Officer Garcia saw blood everywhere, including on the floor and walls. Officer Garcia found Fish in a pool of blood and saw a wound on his back, near his neck. Fish told Officer Garcia he had stabbed himself.

Officer Garcia noticed that blood was dripping from Thompson's left hand, which was wrapped in a piece of clothing. Officer Garcia did not see any bruising, swelling or any other injuries to Thompson other than to her hand. He asked, "Okay, where's the knife?" As Officer Garcia was looking back and forth at Fish and Thompson waiting for

5

a response to his question, Officer Garcia heard a "metal clanking sound on the ground just to [his] right." Officer Garcia next saw a black folding knife resting on the floor a few feet in front of Thompson.[3] According to Officer Garcia, there was another person in the bathroom that night that Officer Garcia later identified as Page. In response to Officer Garcia's question as to what had happened, Thompson responded, "'We were arguing.'"

When Sergeant Kelly Davis arrived at the scene, he asked Page, "What happened here?" Officer Garcia was standing next to Sergeant Davis. Although intoxicated, Page replied, "'She stabbed him in the back of the neck and then sliced him.'" In response to Sergeant Davis's question why Thompson stabbed Fish, Page said, "'Because he fucked the other bitch over there.'" Officer Garcia attempted to interview Page at a picnic table near the bathroom, but Page refused to answer any questions and became abusive and hostile.

Officer Frances Minton testified that when he arrived at the scene, he found Thompson on the bathroom floor sitting in a pool of blood. Thompson was holding her left hand, which was bleeding. Officer Minton asked Thompson what had happened. Officer Minton testified Thompson several times said she did not know.

San Diego Police Detective Bertha Camarena testified she contacted Thompson at a hospital emergency room shortly after the stabbing incident. Thompson had significant cuts to her hand but no other sign of injuries.

---

[3] The record includes a stipulation that a lab analyst subsequently analyzed the knife found by Officer Garcia but was unable to identify any fingerprints.

B. *Defense Evidence*

Thompson testified in her own defense. She met Fish in the park in September 2012, a few months before the stabbing. Thompson at the time was living in her car near the beach. At some point their relationship turned sexual.

A few days before the stabbing, Thompson was in a food line when Fish rode past her on his bicycle and for no reason kicked her. This was not the first time Fish had kicked Thompson. Thompson in response told Fish to stop kicking her because it was both painful and embarrassing.

That evening, Fish told Thompson he was sorry for kicking her earlier. Fish smelled of alcohol. As they talked, Fish became disrespectful, which upset Thompson. Thompson grabbed Fish's phone after he started checking for messages. The argument escalated. Thompson tried to put Fish's phone in his backpack. Fish in response ran at Thompson, pushed her to the ground and pinned her, while demanding the return of his phone.

On the day of the stabbing, Thompson and Fish were drinking together in the park area with some of Fish's other friends. In the evening, Fish became intoxicated and started to make jokes about Thompson. Because it was raining, the group went into the bathroom.

Thompson later went outside and when she returned, Fish was on the phone. She overheard Fish say, "I love you,'" and inferred that Fish was talking to his former girlfriend. They both went outside. As they were arguing, a mutual friend named "Nick"

7

approached. Nick, Thompson and Fish then went back inside the bathroom. At that point, the others had left except Page.

Thompson testified she started to flirt with Nick. Nick later walked Thompson to her car, where they became "intimate." Afterwards, Thompson alone returned to the bathroom. Thompson found Fish and Page passed out. When Thompson awakened Fish, he seemed upset and asked Thompson why she had bothered coming back. As Thompson was looking for some cigarettes, Fish pushed her hard against the wall and struck her in the face with his fist. Fish next grabbed Thompson around the neck and continued striking her as she fell to the floor. According to Thompson, Page was unconscious during the attack.

Thompson found a knife on the floor she said belonged to Fish. Fish had received the knife for Christmas. However, Fish was attempting to barter the knife because it was unlawful for him to carry a weapon under the terms of his probation. Earlier that evening, Thompson had seen the knife resting on a sink in the bathroom.

Thompson testified she swung the knife at Fish to get him to stop his attack. Thompson swung the knife at Fish a second time when he continued his attack. She then managed to roll Fish off of her and run outside.

Thompson testified that Fish followed her outside, knocked her to the ground and attempted to take the knife away from her. When Fish could not get the knife out of Thompson's hand, he used both his hands to push the knife toward her. Thompson believed Fish intended to slash her throat. Although cut in the struggle, Thompson

8

managed to push Fish off of her. She then ran back into the bathroom and attempted to awaken Page so that she could use his telephone to call for help.

Thompson first realized Fish was hurt when he followed her back into the bathroom. At that point, Page awakened because Thompson was screaming they both needed medical attention. Thompson sat down next to Page, started to cry and told him about the attack by Fish. In response, Page told Fish he was no longer welcome in the park area. About 10 minutes later, Crosbie came into the bathroom. When police arrived and asked about the knife, Thompson said she retrieved it from under a blanket, where she had hidden it from Fish, and slid it across the floor to the officer.

DISCUSSION

I

Thompson contends the court erred when it refused to allow Thompson to cross-examine Fish regarding the maximum punishment he faced in state prison *if* it was subsequently determined he violated the terms of his probation.

A. *Additional Background*

Outside the presence of the jury, the defense sought to use the terms of Fish's probation to impeach Fish on cross-examination. In particular, the defense argued Fish had a motive to lie on the witness stand because Fish was on probation and if his probation was revoked, he could go to prison. The court agreed this line of questioning was relevant on the issue of bias but limited the defense to asking, "Are you [i.e., Fish] on probation, and if you violate any laws, can your probation be revoked?" or "something like that in generic terms." However, the court refused to allow the defense to get into

9

specific details regarding Fish's alleged probation violation because, according to the court, that issue was still pending.

In response, the defense argued that, if one of the terms of Fish's probation was he not drink or have weapons, Fish had the motive not to tell the truth that he was drinking alcohol on the day of the attack or that the knife belonged to him. With regard to the use of alcohol, the court noted Fish's probation order merely said he should not knowingly use or possess alcohol *if* directed by probation. The court also noted that Fish admitted he was drunk on the night of the stabbing and thus, with regard to alcohol use, he had little motive to testify in a certain way out of concern for violating probation.

With regard to weapons and the terms of probation, the court noted Fish was not allowed to knowingly "possess a firearm, ammunition or deadly weapon.'" The court thus found this *was* a "relevant area of inquiry" if the defense wanted to argue the theory that the knife belonged to Fish and, as such, that he had a motive to lie or risk violating the terms of his probation.

Next, the defense argued it wanted to impeach Fish about using force or threats of violence on another, which was another term of Fish's probation. The defense's theory, as noted, was that Fish was the aggressor in the stabbing incident and, if Fish admitted as much, that would be a separate basis to violate his probation. The defense specifically asked the court whether Fish could be asked the following question: "Whether he understands that for those violations, he [could be] revoked and go to state prison for up to five years, goes to his motive to testify?"

10

In response, the court noted this particular condition of probation "simply reflects what the law is: you can't assault or batter people." Nonetheless, the court ruled to allow the defense to question Fish about this condition of probation. The court also ruled, however, the number of years Fish might serve in state prison if his probation was revoked was irrelevant and inadmissible. The court therefore found the defense could ask Fish "if he understands that if he violates probation he can go to prison."

The record shows the prosecutor objected to the court's ruling, noting there was no evidence Fish was given any sort of benefit or clemency from the prosecution with respect to the potential violation of probation. In response, the court noted either side could ask Fish whether he has been promised anything for his testimony in this case, inasmuch as "[t]here can be no suggestion that something is true."

The record shows the defense in fact questioned Fish as follows regarding the terms of his probation, including whether he hit Thompson or carried a knife:

"Q [The defense] Now, you don't remember Stacy Thompson being cut during this incident, correct?

"A [Fish] Correct.

"Q You were pretty drunk, right?

"A I was drunk.

"Q Hard to remember what happened, correct?

"A Correct.

"Q And you didn't hit her?

"A No, I never hit her.

11

"Q Never hit her.

"A Never.

"Q And you didn't cut her?

"A I didn't cut her. I don't have a knife. I'm not allowed to carry a knife.

"Q And you're not allowed to carry a knife because you're on probation, right?

"A Correct.

"Q And there are conditions of your probation.

"A Yes, there are.

"Q And one of those conditions is that you not have a knife, correct?

"A Correct.

"Q So you know that if you're carrying a knife, you could be violated on your probation?

"A Correct.

"Q And you could go to state prison for that, correct?

"A Yes, sir."

B. *Guiding Principles and Analysis*

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) This right "includes the right to cross-examine adverse witnesses on matters reflecting on their credibility." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 841– 842.) "As the high court has explained, cross-examination is required in order 'to expose

to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' [Citation.]" (*People v. Smith* (2007) 40 Cal.4th 483, 513.)

Nonetheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679; see *Crane v. Kentucky* (1986) 476 U.S. 683, 690.) "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623–624.)

"As long as the cross-examiner has the opportunity to place the witness in his or her proper light, and to put the weight of the witness's testimony and credibility to a reasonable test which allows the fact finder fairly to appraise it, the trial court may permissibly limit cross-examination to prevent undue harassment, expenditure of time, or confusion of the issues." (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1386; see *People v. Ayala* (2000) 23 Cal.4th 225, 269 [noting in the exercise of the right to confront a witness "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence'"].)

Here, under these standards, we conclude the trial court did not violate Thompson's right under the confrontation clause by refusing to allow the defense to

13

question Fish regarding the maximum number of years he *potentially* could face in state prison *if* he was found at a subsequent hearing to be in violation of the terms of probation. The "evidence" of the maximum number of years Fish could serve in state prison, if such a violation was found, was "only marginally relevant," at best (see *Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679), and "was not obviously probative on the question" of his reputation for honesty or veracity or their opposites (see *People v. Dement* (2011) 53 Cal.4th 1, 52).

What's more, the record shows Thompson "otherwise had 'ample opportunity' to impeach [Fish]" (see *People v. Contreras* (2013) 58 Cal.4th 123, 153) on various subject matters, including those related to the potential violation of probation. Indeed, as noted *ante*, the defense questioned Fish about whether he previously had been convicted of robbery; whether he was on probation during Thompson's trial; whether he understood that possession of a knife/deadly weapon violated the terms of his probation; and whether he understood that a violation of probation could result in a prison sentence.

In addition, the record shows the defense during closing argument aggressively attacked Fish's credibility in arguing that Thompson acted in self-defense when she used the knife against Fish. The defense specifically argued that Fish's "credibility [was] impeached"; that he was "not a nice guy"; that he was a "serious alcohol abuser" whose blood alcohol at the time of the stabbing was "quadruple the legal limit for driving" in California; that he recently was convicted of robbery, a felony; and that he had a penchant for lying, as demonstrated by the fact he was untruthful when he initially told the police his wounds were self-inflicted.

14

On this record, we conclude Thompson had more than an ample opportunity to place Fish "in his . . . proper light, and to put the weight of [his] testimony and credibility to a reasonable test which allows the fact finder fairly to appraise it." (*In re Ryan N.*, *supra*, 92 Cal.App.4th at p. 1386.)

As such, and given our conclusion that any evidence of the maximum prison term Fish *could* face *if* he was found to be in violation of probation was at best "only marginally relevant" (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679), we conclude a reasonable jury would not have received a significantly different impression of Fish's credibility had the excluded cross-examination been permitted. (See *People v. Quartermain*, *supra*, 16 Cal.4th at pp. 623–624; see also *People v. Whisenhunt* (2008) 44 Cal.4th 174, 208 [noting the court properly limited the cross-examination of a witness regarding the specifics of an alleged affair between the witness and the defendant's friend because the "additional impeachment value of the excluded evidence was minimal in relation to the major areas of impeachment already raised by the admitted evidence, and a reasonable jury would not have received a significantly different impression of [the witness's] credibility even if the excluded evidence had been admitted"]; compare *People v. Allen* (1978) 77 Cal.App.3d 924 [noting the court erred in refusing to allow cross-examination of the defendant's accomplice, a minor, and of the minor's mother, regarding two other robbery charges pending against the minor because the defendant was prevented from effectively attacking the credibility of both witnesses by showing a motive to fabricate, to wit: an expectation that if the minor identified defendant as an

15

accomplice in the robbery, the minor in return would be shown leniency in the resolution of the other recent charges then pending against him].)

II

Thompson next contends defense counsel was ineffective for failing to object to Page's out-of-court statements that Thompson stabbed Fish "in the back of the neck, then sliced him" and that Thompson did so because "he fucked that bitch over there," as testified to by Page and Officer Garcia.

A. *Additional Background*

As noted *ante*, Page testified inconsistently regarding whether he made statements to the police on the night of the stabbing. Specifically, Page testified as follows regarding this issue:

"Q [Prosecutor] Did you speak to the police about this incident?

"A [Page] No, sir.

"Q Did you speak to an officer on the scene by the name of Sergeant Davis?

"A I might have. He's a friend of mine.

"Q You know Sergeant Davis?

"A Yes, sir.

"Q Okay. Did you tell -- did you give a statement to Sergeant Davis?

"A I might have.

"Q Okay. I'm going to -- did you tell Sergeant Davis how this attack occurred?

"A I was asleep.

"Q Okay. You told Sergeant Davis that you were asleep?

16

"A Yes, sir.

"Q Okay. If I showed you a report of Sergeant Davis' about what you said, would that -- do you think that would refresh your recollection as to what you told Sergeant Davis?

"A I don't remember even talking to him.

"[Prosecutor]: If I can have one moment, please, your honor.

"The Court: All right. Since he's said he doesn't remember, you can treat it as impeachment with a prior statement. Just ask him if he said what's in the report.

"Q All right. Did you tell Sergeant Davis when you had left the restroom that evening that, quote, 'She stabbed him in the back of the neck, then sliced him?' Did you tell Sergeant Davis that?

"A I could have.

"Q Okay. Did you also tell Sergeant Davis -- when Sergeant Davis asked you why it had happened, did you tell Sergeant Davis 'Because he fucked that bitch over there'?

"A That don't make any sense to me.

"Q Okay. So you didn't tell Sergeant Davis that?

"A No.

"Q So when asked by the police to describe what happened, you didn't tell them that Ms. Thompson had stabbed the back of Mr. Fish's neck and then sliced him?

"A I didn't see that. I saw the aftermath of it.

"Q But you're saying you didn't tell the police that?

17

"A  I don't remember."

As also noted *ante*, Officer Garcia testified he was standing next to Sergeant Davis on the night of the stabbing when Page made the statements, "She stabbed him in the back of the neck, then sliced him" and "Because he fucked that bitch over there," in response to Sergeant Davis's questioning.  In addition, the record shows that when Crosbie initially entered the bathroom, he saw Page awake and sitting on the floor right next to Thompson.

B.  *Guiding Principles*

""A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions.  [Citations.]  'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.'"  [Citations.]  It is defendant's burden to demonstrate the inadequacy of trial counsel.  [Citation.]  [The California Supreme Court has] summarized defendant's burden as follows:  "In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.]  Second, [the defendant] must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."""  [Citation.]  [¶]  Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of

18

counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: "'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" [Citation.]' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875–876.)

C. *Deficiency*

We conclude the defense had a rational tactical reason for not objecting to Page's and Officer Garcia's testimony regarding Page's out-of-court statements to Sergeant Davis because we conclude on this record that testimony was admissible under Evidence Code section 1235. That statute provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."[4]

The "fundamental requirement" of Evidence Code section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony. (*People v. Sam* (1969) 71 Cal.2d 194, 210.) Thus, the testimony of a witness that he or she neither remembers an event nor making a statement generally is not "inconsistent" within the meaning of

---

[4] Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

19

Evidence Code section 1235 with that witness's prior statement describing the event. (See *People v. Green* (1971) 3 Cal.3d 981, 988.)

"However, courts do not apply this rule mechanically. 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.' [(*People v. Green*, *supra*, 3 Cal.3d at p. 988.)] When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. (*Id.* at pp. 988–989.) As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper. [Citation.]" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219-1220; see *People v. Gunder* (2007) 151 Cal.App.4th 412, 418 [noting that in admitting the "prior extrajudicial statement of a forgetful witness as an inconsistent statement, the forgetfulness must be feigned rather than the consequence of a float [through] the waters of Lethe"].)

Here, the record provides a sound and reasonable basis for the court's implicit conclusion that Page's testimony that he did not remember making the statements to Sergeant Davis and Officer Garcia on the night of the stabbing was the result of Page being purposely evasive, as demonstrated by his testimony (on more than one occasion) that he "might" have given a statement to his "friend" Sergeant Davis that night and his testimony that he "could" have told the officers that Thompson "stabbed him [i.e., Fish] in the back of the neck, then sliced him."

20

The record shows Page had a possible motive to feign memory loss, as he and Thompson were friends (see *People v. Gunder*, *supra*, 151 Cal.App.4th at p. 418) and like Fish and Thompson, Page lived in the Mission Bay park area where the stabbing occurred.

Moreover, although Page was intoxicated on the night of the stabbing when he made the statements to the officers that he claimed at trial he could not, or might not, remember, the record shows Page testified regarding various details about that night, including that Thompson and Fish were getting along "just fine" before the stabbing; that they initially went into the bathroom to escape the rain; that Thompson had been drinking hard alcohol and beer along with their group; that also in the bathroom was a person named Mark Thompson (ostensibly not related to the defendant); and that while in the bathroom they all passed a bottle around, drank some beers and were getting along "fine" before the stabbing. The fact Page could remember these details, on the one hand, but provided ambiguous testimony whether he could not or might not remember making the statements immediately following the stabbing, on the other hand, further supports our conclusion there was a sound basis for the trial court to implicitly find, after "observing the demeanor of the witness" (see *People v. Gunder*, *supra*, 151 Cal.App.4th at p. 418), that Page was being evasive on the witness stand.

As such, we conclude the admission of Page's prior statements to Sergeant Davis and Officer Garcia was proper. (*People v. Johnson*, *supra*, 3 Cal.4th at pp. 1219-1220.) In light of that conclusion, we further conclude Thompson's counsel had a rational tactical reason not to object to the testimony of either Page or Officer Garcia regarding

21

these statements and was therefore not ineffective. (See Evid. Code, § 1235; see also *Strickland v. Washington* (1984) 466 U.S. 668, 689 [noting "a court must indulge a strong strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"].)

D. *Prejudice*

Finally, even assuming Thompson's counsel was deficient in failing to object to the testimony of Page and Officer Garcia regarding Page's prior statements, we conclude Thompson cannot show resulting prejudice. (See *People v. Vines*, *supra*, 51 Cal.4th at pp. 875-876.) As noted, prejudice is shown "'"when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"'" (*Id.* at p. 876.)

Turning first to Page's statement, "because he fucked that bitch over there," it is not clear from the record what exactly Page meant by it and who he was referring to when used the words "bitch over there," since the record shows that Fish only talked on the telephone to his former girlfriend on the night of the attack and that there were no women in the bathroom other than Thompson. At best, this statement is ambiguous and its admission therefore was not prejudicial because it is not reasonably probable Thompson would have obtained a better result had it been excluded. (See *People v. Vines*, *supra*, 51 Cal.4th at pp. 875-876; see also *People v. Watson* (1956) 46 Cal.2d 818, 835.)

22

With regard to the statement, "she stabbed him in the back of the neck, then sliced him," we note there is no dispute on this record that Thompson in fact used a knife to stab and slice Fish. Rather, the dispute focused on whether Thompson did so in self-defense, as she testified at trial and as the defense aggressively argued in closing, a theory the jury rejected. Thus, the admission of this statement also was not prejudicial because it is not reasonably probable the outcome of the case would have been different had the statement been excluded. (See *People v. Vines*, *supra*, 51 Cal.4th at pp. 875-876; see also *People v. Watson*, *supra*, 46 Cal.2d at p. 835.)

III

Finally, Thompson contends the court erred when, over the defense's objection, it instructed the jury as follows with CALCRIM No. 3471, as modified: "A person who starts a fight has a right to self-defense only if: [¶] 1. (She) actually and in good faith tried to stop fighting; [¶] [AND] [¶] 2. (She) indicated, by word or by conduct, to (her) opponent, in a way that a reasonable person would understand, that (she) wanted to stop fighting and that (she) had stopped fighting(.) [¶] If the defendant meets these requirements, (she) then had a right to self-defense if the opponent continued to fight."[5]

The record shows the defense objected to CALCRIM No. 3471 on the ground it was not supported by the evidence, to wit: that Thompson was the initial aggressor in the

---

5      We note the jury also was instructed with CALCRIM No. 3470, which properly reflects the law of self-defense. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083; CALCRIM No. 3470.)

23

fight with Fish. The court rejected this claim, finding there was "sufficient evidence to believe that a reasonable jury could believe the defendant was the initial aggressor."

It is axiomatic that "[a] party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.] At the same time, instructions *not* supported by substantial evidence should not be given. [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049–1050, quoting *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

Here, the record contains ample evidence to support instructing the jury with CALCRIM No. 3471. Indeed, Fish testified Thompson was the initial aggressor in the fight when she became angry after Fish told his former girlfriend he still loved her. In response, Thompson snatched Fish's phone. When Fish finally got his phone back, he began to walk out of the bathroom when, according to him, Thompson came from behind and stabbed him multiple times with a knife. The record also includes evidence from the day before the stabbing showing Thompson as the aggressor when she and Fish were arguing, including evidence that Thompson hit Fish in the head and chased Fish around a parking lot, while Fish attempted to avoid the conflict.

Although Thompson disputed Fish's account of the stabbing, including the events leading up to it, we independently conclude Fish's testimony was more than sufficient to

24

support instructing the jury with CALCRIM No. 3471, as the trial court correctly found.

(See *People v. Ross*, *supra*, 155 Cal.App.4th at pp. 1049–1050.)[6]

DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

McDONALD, J.

---

6     Because we have rejected each of Thompson's individual claims of error, there is no cumulative error. (See *People v. Tully* (2012) 54 Cal.4th 952, 1061.)